Filed 8/20/25  In re R.G. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re R.G., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. N.G. et al., Defendants and Appellants. | G065173 (Super. Ct. No. 20DP0838) ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT |

It is ordered the opinion filed August 15, 2025, be modified as follows:

On page 1, fifth line from the bottom, delete "Affirmed in part and reversed in part" and replace with "Dismissed in part; reversed and remanded in part."

There is no change in the judgment.

                              SANCHEZ, J.

WE CONCUR:


MOORE, J.


MOTOIKE, ACTING P. J.

2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re R.G., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. N.G. et al., Defendants and Appellants. | G065173 (Super. Ct. No. 20DP0838) O P I N I O N |

Appeals from orders of the Superior Court of Orange County, June Jee An, Judge. Affirmed in part and reversed in part.

John P. McCurley, under appointment by the Court of Appeal, for Defendant and Appellant M.M.

Megan Turkan Schirn, under appointment by the Court of Appeal, for Defendant and Appellant N.G.

Leon J. Page, County Counsel, Debbie Torrez and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

\*      \*      \*

INTRODUCTION AND SUMMARY

M.M. (Mother) is the mother and N.G. (Father) is the father of R.G., who was detained in July 2020 and placed in the custody of R.G.'s maternal uncle and aunt. Mother appeals from the juvenile court's orders, made at a Welfare and Institutions Code section 366.26[1] hearing, terminating parental rights and denying her petition made under section 388. Father appeals from the orders terminating parental rights and denying his order to show cause re contempt (OSC re contempt).[2] For reasons explained below, we reverse the order denying Mother's section 388 petition and the order terminating parental rights and dismiss Father's appeal from the order denying the OSC re contempt for lack of jurisdiction.

Because this is a complicated case with a long history, a summary is in order. At a section 366.26 hearing in September 2022, the juvenile court terminated Mother's and Father's reunification services and appointed maternal aunt and uncle (the Guardians) as R.G.'s guardians. The court found the parental benefit exception applied and granted Mother and Father visitation rights. R.G. was happy and thrived in the Guardians' care.

The juvenile court subsequently determined that another section 366.26 hearing was in order to determine whether to terminate parental

---

[1] Further code references are to the Welfare and Institutions Code unless otherwise cited.

[2] Father joins in Mother's arguments, and Mother joins in Father's argument to the extent they are beneficial to her interests.

rights and make adoption the permanent plan. The court ordered the prior visitation order, with some modifications, remain in place.

After May 2024, the Guardians ceased allowing Mother and Father any visitation because, the Guardians claimed, they caused R.G. too much stress and trauma. In response, in June 2024 Mother brought her section 388 petition, which requested the court to remove discretion from the Guardians over visitation. Father brought his OSC to hold the Guardians in contempt for refusing to obey the visitation order.

The juvenile court decided to hold a hearing on Mother's section 388 petition and Father's OSC re contempt at the same time as the second section 366.26 hearing. The combined hearing did not commence, however, until September 2024 and did not conclude until January 2025. During that period of time, the Guardians continued to refuse Mother and Father any visitation with R.G.

On January 31, 2025, over seven months since Mother and Father had last been permitted to visit R.G., the juvenile court terminated parental rights and ordered adoption as the permanent plan. The juvenile court found the first two elements of the parental benefit exception had been met but concluded termination of parental rights would not be detrimental to R.G. In reaching that conclusion, the court considered the amount of time that had elapsed since R.G. had seen Mother and Father—a result which Mother's section 388 petition had sought to prevent. After terminating parental rights, the juvenile court denied Mother's section 388 petition and Father's OSC re contempt.

The juvenile court erred by denying Mother's section 388 petition and by combining a hearing on Mother's petition with the section 366.26 hearing. The Guardians were in direct violation of the visitation order by

3

denying visitation altogether and, in effect, were impermissibly delegating to themselves the authority to control visitation and decide what was in R.G.'s best interest. Visitation was critical to Mother's and Father's ability to meet their burden of proving the parental benefit exception, and the juvenile court's decisions made it more difficult for them to meet that burden at the section 366.26 hearing.

The juvenile court had a duty to hear and rule on Mother's section 388 petition as soon as was practicable after it was filed and to take necessary action to enforce the visitation order well in advance of the section 366.26 hearing. Combining the hearing on Mother's section 388 petition and the second section 366.26 hearing might have seemed to be an efficient means of proceeding, but it has proved to be a false economy.

FACTS AND PROCEDURAL HISTORY

I.

FACTS AND PROCEDURAL HISTORY THROUGH NOVEMBER 2023

This child welfare proceeding has been the subject of three prior nonpublished opinions: *In re R.G.* (June 28, 2022, G059645) (*R.G. I*), *In re R.G.* (May 8, 2023, G061682) (*R.G. II*), and *M.M. v. Superior Court* (Feb. 27, 2024, G063381) (*R.G. III*).

*R.G. I*, *R.G. II,* and *R.G. III* cover the facts and procedural history from July 2019, when Mother and Father had their first contact with the child welfare system, through November 2023, when the juvenile court ordered the second section 366.26 hearing. For that period of time, we provide this chronology:

**July 10, 2020**: Orange County Social Services Agency (SSA) files a child welfare petition against Mother and Father.

4

**July 21, 2020**: R.G. is detained and placed in the home of the Guardians.

**November 5 2020**: The jurisdictional hearing is held. The juvenile court sustains the allegations of the child welfare petitions and declares R.G. to be a dependent child of the court. Custody is vested with SSA, which is ordered to provide both Mother and Father reunification services.

**July 16, 2021**: Contested six-month review hearing is held. The juvenile court finds Mother's progress to be minimal and Father's progress to be none. The court continues reunification services for six months. **~(CT 590-592/536-538)~**

**December 6, 2021**: Contested 12-month review hearing is held. The juvenile court terminates reunification services and orders a section 366.26 hearing be held within 120 days. The court approves the SSA recommended visitation plan.

**April 1, 2022**: Mother files a section 388 petition requesting that R.G. be returned to her custody or that visitation be liberalized and reunification services restored.

**May 10, 2022**: Father files a section 388 petition requesting that R.G. be returned to his custody or that visitation be liberalized and reunification services be restored.

**May 10, 2022 intermittently to August 9, 2022**: An evidentiary hearing on Mother's and Father's section 388 petitions is conducted. The juvenile court modifies the visitation order to allow eight hours of supervised visitation for each parent and continues the section 366.26 hearing to September 19, 2022.

**September 19, 2022**: The first section 366.26 hearing is held. The juvenile court finds the parental benefit exception to termination of parental rights applies and orders legal guardianship as the permanent plan. The court appoints the Guardians as R.G.'s legal guardian. The court approves a new visitation plan (the September 2022 visitation order) which grants Mother and Father each two supervised visits of at least three hours in length twice per month. The Guardians are granted discretion to set the dates, times, and locations for visits.

**March 2023**: SSA status review report recommends scheduling a new section 366.26 hearing on the ground the permanent plan of legal guardianship is no longer appropriate.

**November 17 and 20, 2023**: A post permanency review hearing is held. The juvenile court finds the permanent plan of legal guardianship might no longer be appropriate and orders another section 366.26 hearing be held within 120 days. The court orders a bonding study for Mother and Father and keeps the September 2022 visitation order in place.

II.

VISITATION: NOVEMBER 2023 THROUGH MAY 2024

We focus our statement of facts on visitation because it is the dominant issue in this appeal. The visitation order stated, "[t]he parents are to have supervised visitation with the child at least twice per month for a minimum of three hours per visit" and "[t]he date and time for each visit, as well as the pickup location and drop-off location for each visit, are to be set by the legal guardians consistent with the best interests of the child." At the November 2023 postpermanency hearing, the visitation order was modified by adding: "Legal guardians shall provide visits on the dates listed above in

6

the proposed orders. Legal guardians shall notify the parents of the time of the visits from today through March 2024 by close of business on November 22, 2023."

In *R.G. III*, we described Mother's visits from September 2022 to October 2023 as follows: "From September 2022 to October 2023, although a total of 24 possible visits were scheduled, Mother only saw R.G. in person eight times. Sometimes this was due to circumstances outside Mother's control (such as R.G. being sick or the supervisor having scheduling conflicts), but other times it was because Mother cancelled or failed to confirm the visits. Further complicating visitation was the fact that Mother relocated to Hawaii in early 2023, and the guardians reportedly refused to modify the visitation schedule to accommodate back-to-back visits one weekend per month. [¶] As for the visits that Mother did attend, the supervisor reported those visits went well; Mother was loving and attentive. R.G. also appeared happy when she saw her parents and asked Mother if they could spend more time together. However, the guardians reported R.G. continued to demonstrate poor behavior and tantrums after the visits were over." (*R.G. III, supra*, G063381, p. 9, footnote omitted.)

Since the time period covered in *R.G. I*, *R.G. II*, and *R.G. III*, Mother and Father visited R.G. on November 24 and December 29 (Mother only) 2023, and January 26 and 29, February 8, 9, and 16, March 28 and 29, April 19, and May 7, 2024. These visits show R.G. becoming increasingly alienated from Mother and Father and confused or conflicted about her relationship with them. After May 2024, the Guardians refused to allow Mother and Father to visit R.G.

During the visit on November 24, 2023, R.G. told Mother and Father that she had "2 Mommy and 2 Daddys." During the visit on December

7

29, 2023,[3] R.G. sometimes called Mother "Mom" and sometimes used her first name. The visitation monitor reported that Mother and R.G. hugged at the beginning of the visit, Mother brought R.G. Christmas gifts, and Mother and R.G. "seemed to have somewhat of a bond." The Guardians told the social worker that on the way to the visit R.G. said "mommy I don't want to go my visit" and on the way home said "I don't want to go on any more visits." The Guardians claimed that after arriving home, R.G. had "a meltdown and a screaming fit."

During the visit on January 26, 2024, R.G. was excited to see Mother but told her, "my mom said I can't kiss you" and "my mommy said don't kiss me; that I'm not allowed to kiss you or you kiss me." The visitation monitor reported that during the visit on January 28, 2024, R.G. seemed confused about whether to call Mother and Father "mommy" and "daddy" or by their first names; if R.G. used "mommy" or "daddy" she would correct herself and say their first names. But at the end of the visit, the monitor heard R.G. loudly say to Mother, "I want to go home with you."

During the visit on February 8, 2024, the visitation monitor observed that R.G. still appeared to be conflicted about whether to call Mother and Father by their first names. The monitor reported there was a lot of laughter and hugs during the visit. At the February 9 visit, R.G. again told

---

[3] The Guardians initially refused visits scheduled for December 22 and 29, 2023 on the ground that Mother had not timely confirmed the dates. In an ex parte application requesting the court to order the caregivers to make R.G. available for the scheduled visits, Mother explained she had not confirmed the dates because the postpermanency review hearing was pending and the court did not issue its orders until November 20. The juvenile court ordered the Guardians to make R.G. available for a visit on December 29 and a make-up visit sometime in January 2024.

Mother and Father not to kiss her because the Guardians said it was not allowed. R.G. called Mother and Father by their first names but told Mother she really missed her. The visitation monitor told the assigned social worker that visits had been going well overall.

The Guardians reported R.G. was having more tantrums and behavioral issues following visits with Mother and Father. The Guardians also reported that before the January 26 and February 8 visits R.G. told them she did not want to the visit and after January 26 visit R.G. "had a meltdown at dinner."

On April 19, 2024, when the visitation monitor arrived at the visit location, R.G. was still sitting in the Guardians' car. R.G. told the monitor, "'[I] don't want to go to these visits anymore.' I don't want to see [Mother] and [Father] anymore." The monitor said to R.G, "let's just go in and have some fun" and "we won't be here that long and then [maternal aunt] can pick you back up." R.G. agreed, got out of the car, and went with the monitor to the visit.

The monitor reported that R.G., rather than running straight into Mother's arms, as she usually did, said "No" to Mother's gesture for a hug and told Mother she did not want to have visits anymore. When Father approached with outstretched arms, R.G. also told him, "no." R.G. told Mother and Father that the Guardians took her away from them because "they were not treating her right." R.G. said she did not want to come to the visit because her cousin was having a party that day and friends were at the Guardians' home. Mother told R.G. "oh, sorry." After that, Mother and R.G. laughed, hugged and played. R.G. played with Father too, but not for long, and told him she wanted Mother or "'mommy.'" The monitor reported that

9

R.G. seemed to "really enjoy" the visit on April 19 and "[R.G.] always seems to change as [maternal aunt] would leave."

Just 30 minutes before a visit scheduled for April 26, 2024, the Guardians contacted the visitation monitor and canceled the visit because "[R.G.] was throwing a fit and refusing to come to the visit." The Guardians declined Mother's request for a short facetime visit or a make-up visit. The Guardians later told the assigned social worker that R.G. was at gymnastics when she was told it was time to leave for the visit.

The May 7, 2024 visit was held at SSA's offices and was part of an Evidence Code section 730 evaluation by the court-appointed psychologist, Gerardo D. Canul, Ph.D. Although the visit seemed to go well, R.G. several times expressed her desire to have no physical contact with Mother and Father and showed no signs of affection toward them. When Father asked R.G. if she missed him, R.G. answered "no" and said "I'm leaving now." R.G. took two steps toward the door, turned around, and said "'jk'"—just kidding. Near the end of the visit, R.G. spontaneously told Mother and Father "this is my last visit."

On May 24, 2024, the Guardians canceled the visit scheduled for that day while the visitation monitor was in transit. In a text message, maternal aunt stated that R.G. adamantly did not want to go to the visit. In response, the monitor reminded maternal aunt that visitation was a court order and that because the cancellation was within 24 hours of the visit, Mother and Father would be charged the full fee. Maternal aunt sent a text message back stating "Let's see how [R.G.] does in the next 10 minutes and her gymnastics is over." Five minutes later, the monitor received the following text message from maternal uncle: "Miss Shirley, as apparently illegal [*sic*] guardian of [R.G.]. I'm going to have to stand beside my wife and

10

the best interest of *my daughter* and respectfully not put her in that situation. As far as the charge to us for M[other]'s visits that will not be on us either. Thank you for your understanding. We will see you on May 30. Have a blessed day." (Italics added.)

The monitor texted maternal uncle about having a make-up visit. He responded: "Miss Shirley, my job is to protect my family. This has been dragged out for four years. l have literally watched the mental trauma before my eyes with how a five-year-old girl can hear weekly from strangers that were her mom and dad and the parents raising her are not, and she doesn't have to listen to us to plug her ears when we ask her to do things respectfully. We will wait for the court order on May 30 for directions."

On May 30, 2024, while driving to a visit, the visitation monitor received a text message from maternal aunt canceling the visit.

At a June 17, 2024 monthly compliance contact, the Guardians told the social worker that R.G.'s behavior had been much better recently and her "acting out" behavior has decreased since visits with Mother and Father had ended. R.G. appeared to be happy, active, and comfortable being around the guardians. When told that maternal uncle had arrived home at the end of the visit, R.G. yelled, "'Daddy's home'" and ran to the garage to see him. The Guardians told the social worker that the visits with Mother and Father affected R.G.'s behavior and it was not in R.G's best interest to force her to attend them. The Guardians confirmed they would take full responsibility at the next court hearing for canceling the visits in May and not scheduling visits for June. The social worker urged the Guardians to comply with the visitation order and to encourage R.G. to attend visits, but also told them that SSA did not recommend forcing R.G. to attend.

11

The Guardians did not set dates for visits in July. They said they would not set any visitation date until after the section 366.26 hearing, which had been scheduled for July 18, 2024.

The clinical notes of R.G.'s therapist for the time period of April through June 2024 include the entry that R.G. was in a happy mood when interacting with the Guardians but, when discussing Mother and Father, would look down, become serious, and altogether ignore questions regarding visits. The therapist also stated: "[R.G.] has identified feelings of happiness when discussing current living arrangements with guardians. [R.G.] additionally has identified feelings of sadness and fear when engaging in dialogue regarding not living with current guardians."

### III.

### MOTHER'S SECTION 388 PETITION

Mother filed her section 388 petition on June 28, 2024. The petition alleged the Guardians were "willfully disobeying the Court's orders" by canceling visits with R.G. and requested the court remove all discretion from the Guardians to cancel or schedule visits, vest such discretion solely with SSA, and order make-up visits for all canceled visits.

That same day, the juvenile court heard argument on Mother's section 388 petition. At the conclusion of the hearing, the court set a hearing on the petition for July 18, 2024, which was also the date set for the section 366.26 hearing. The court ordered a visit with R.G. take place before the hearing date. That order, the court said, was "nonnegotiable."

When the social worker informed the Guardians of the court order, they balked at it. Maternal uncle wrote in a text message that he would not force R.G. (whom he again described as "my daughter") to visit

12

Mother and Father because visits were detrimental to her health. Maternal uncle was willing to "answer to the court" at the hearing on July 18.

No hearing was conducted on July 18. Due to court and party unavailability, the section 366.26 hearing and the hearing on Mother's section 388 petition were continued to August 21, 2024. The court ordered a birthday visit before that date. The social worker informed the Guardians of the court order.

Mother contacted the social worker by e-mail several times in July and August to ask about visits with R.G. and the possibility of having a telephone call with her. The most the social worker could say was she had not received any dates from the Guardians. Once it was certain that no birthday visit with R.G. would be scheduled, Mother sent R.G. flowers and a birthday card to her school.

During a compliance contact visit on August 13, 2024, the Guardians told the social worker they had seen improvement in R.G.'s behavior since visits with Mother and Father were discontinued. R.G. no longer threw tantrums and was happy and peaceful. During the visit, R.G. referred to Guardians as "mommy'" and "daddy" and their children as "sister" and "brother." The Guardians had not scheduled any visits.

On August 21, 2024, the juvenile court continued the hearings to September 4 due to a change in counsel by one party. Mother's counsel objected to the continuance. The court again ordered a visit with R.G. to take place before the hearing date. The social worker again informed the Guardians of the court order, but again, no visitation dates were forthcoming from the Guardians. From August through October 2024, the Guardians declined to schedule visits because they believed visits with Mother and Father were detrimental to R.G.

13

Mother continued to contact the social worker by e-mail to ask about visits with R.G. The social worker continued to respond by saying she had informed the Guardians of the court's visitation order but they had not provided any dates for visits.

## IV.

### BONDING STUDIES

Two bonding studies were conducted in this case in the time period following *R.G. III*. The first was conducted in March 2024 by Jessica Borelli, Ph.D., who had been retained by Mother. Borrelli interviewed Mother, R.G., and R.G.'s therapist. Borrelli also observed two visits Mother and Father had with R.G. and reviewed several SSA reports.

Borelli concluded: (1) "[R.G.] exhibited a strong desire to connect with her mother. Her desire to connect was particularly salient in the realm of her desire for physical contact and closeness during play," (2) "[R.G.] has been trying for a long time to connect with her mother but experienced many challenges to the connection in the form of prolonged separation and negative messages from her home environment," (3) "[R.G.] is torn between two families," (4) "[R.G.] has an attachment bond with Mother," and (5) if parental rights were to be terminated, it is anticipated that R.G. "would experience anxiety, sadness, depression, and hopelessness because of the loss for this relationship."

While interviewing R.G. at the Guardians' home, Borrelli observed that R.G. appeared to be apprehensive and anxious in the Guardians' presence, and R.G. said she liked visits with Mother and Father when alone with Borelli for a brief moment. R.G. told Borelli she hated visits because of the baths. R.G.'s cousin G.M. explained, "Yeah, she has to take a

14

bath and my Mommy has to carry her upstairs naked and her arms are like this [folded up] and she has to scrub her until she's red and it hurts her skin." When asked why maternal aunt has to scrub so hard, G.M. said it was because R.G. goes to very dirty places for visits.

R.G. told Borelli that visits with Mother and Father can be "hard" because she misses fun family activities that the Guardians and their children do during the visits. R.G. also said she would enjoy the visits if they were held where she wanted to go. Borelli believed that "[R.G.]'s distress appears to onset after the visit when she returns home and learns about what she missed doing with [the Guardians and their children] and when she has to have her post-visit baths."

Borelli noted that when R.G. met Mother and Father at the second observed visit, she immediately told them the Guardians instructed her not to hug or kiss them or call them "mommy" and "daddy." Borelli also observed that in the Guardians' presence, R.G. was apprehensive and appeared anxious about discussing visits and her relationship with her parents. When out of the Guardians' earshot, R.G. told Borelli she liked visits with Mother, then looked toward where maternal aunt was standing. Borelli believed "the current set-up makes forming a connection between [R.G.] and [Mother] difficult and even punishing."

The second bonding study was conducted in May 2024 by Canul in connection with his Evidence Code section 730 appointment. In preparing his bonding study, Canul interviewed Mother and Father individually, the Guardians, R.G.'s therapist, and a visitation monitor. Canul observed a one-hour visit between R.G. and Mother and Father at the SSA's office on May 7, 2024 and reviewed a number of court documents, including social worker reports, minutes, and visitation reports.

Canul found, "[t]he parents and the minor appear to have developed a social relationship that centers around socializing and playing yet, there seems to be a lack of connection, reciprocal warmth or affection between the parents and the minor." He also found: "[Mother and Father] made considerable effort to express their care, affection, and thoughtfulness towards [R.G.] yet, [R.G.]'s expressed positive emotions towards [Mother and Father] were minimal. There was a noticeable absence of physical touch/affection or positive expressed emotions from the minor to the parents. Lastly, the [Mother and Father] appeared to make efforts to engage socially and emotionally with the minor. However, often their verbalizations/prompts/ questions did not receive a response from [R.G.]."

Canul did not address what effect termination of parental rights might have on R.G. Instead, he recommended continued placement with the Guardians and having a visitation monitor as well as a psychotherapist or family counselor present at R.G.'s visits with Mother and Father.

V.

THE SECOND 366.26 HEARING

The juvenile court held the section 366.26 hearing and the hearing on Mother's section 388 petition starting on September 4, 2024, and continuing sporadically over several months until concluding on January 31, 2025. The court received into evidenced the bonding reports prepared by Borelli and Canul, and SSA Reports dated from March 2023 through January 2025. Senior Social Worker Melissa Pereyra, Mother, and Borelli testified. Their testimony will be addressed in the Discussion section when relevant. Father and the Guardians did not testify. The parties stipulated that Canul would have testified consistently with his report.

16

On January 24, 2025, a hearing was held on Father's OSC re contempt against the Guardians. Father's counsel argued the Guardians had been flagrantly violating the visitation order with a sense of impunity and the Guardians were not being held accountable. The juvenile court declined to hold the Guardians in contempt because issuing contempt orders "opens a door that I don't think I want to walk through." The court "strongly" reminded the parties to obey all court orders.

The section 366.26 hearing concluded on January 31, 2025. After hearing closing argument, the juvenile court ordered the termination of parental rights. In addressing the parental benefit exception, the court applied the three-element test of *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). The court found the first and second elements—regular visitation and contact and a relationship the continuation of which would benefit the child— had been proven. The court evaluated the visitation element based on visitation that was allowed. The court stated that visitation had been thwarted by the Guardians and agreed with minor's counsel that if visits had been permitted, "they probably would have gone much like they were [previously] going. . . ."

As to the second element, the court found there was "a substantial, positive, emotional attachment." In making that finding the court found Borelli's testimony to be "very persuasive." The court concluded that R.G.'s impulsivity, excessive energy, and other types of behavior were not "indicative one way or the other of whether she likes the visits or doesn't like the visits."

The juvenile court found as to the third *Caden C.* element that there was "a loving and positive relationship" between Mother and R.G., "and even to some extent between Father and [R.G.]," severing that relationship

17

would not cause R.G. detriment "in the sense that" R.G. would have a "stable and loving home" with the Guardians. The court stated that, in making that finding, "I'm not considering the lack of visits, but at the same time I am considering the amount of time that elapsed since [R.G.] has seen her parents." The juvenile court denied Mother's section 388 petition "in light of the court's ruling [on] terminating parental rights" and denied Mother's request for a continuance under section 352.

DISCUSSION

I.

THE JUVENILE COURT ERRED BY DENYING MOTHER'S SECTION 388
PETITION AND BY COMBINING A HEARING ON THAT PETITION WITH
THE SECTION 366.26 HEARING

A. *Standard of Review*

"Section 388 allows a parent to petition to change, modify, or set aside any previous juvenile court order. (§ 388, subd. (a).) 'The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child.'" (*In re J.M.* (2020) 50 Cal.App.5th 833, 845.)

"We review a juvenile court's denial of a section 388 petition for abuse of discretion, and review its factual findings for substantial evidence." (*In re J.M., supra*, 50 Cal.App.5th at p. 846.) "'"The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason."'" (*In re Stephanie M.* (1994) 7 Cal.4th at pp. 318–319.)

B. *The Parental Benefit Exception*

At a section 366.26 hearing, the court must select adoption as the permanent plan and terminate parental rights unless it finds doing so would

18

be detrimental to the child under a specified statutory exception. (§ 366.26, subd. (c)(1); *Caden C., supra*, 11 Cal.5th at p. 625.) One such exception is the parental benefit exception of section 366.26(c)(1)(B)(i). It applies when "the parent has maintained regular visitation and contact with the child, the child would benefit from continuing the relationship, and termination of that relationship would impose a detriment on the child." (*Caden C.,* at p. 625.) To establish this exception, the parent must prove three elements: "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*Id.* at p. 631.) "The burden is on the parent asserting the parental [benefit] exception to produce evidence establishing that exception." (*In re A.G.* (2020) 58 Cal.App.5th 973, 996.)

At the first section 366.26 hearing, in September 2022, the juvenile court found that termination of parental rights was not in R.G.'s best interest because the parent benefit exception applied to both Mother and Father. In so finding, the court found that a bond existed between R.G. and her parents, and continuation of the parental relationship would benefit R.G.

At the post permanency hearing in November 2023, the juvenile court noted that, in SSA's opinion, Mother's and Father's contact with R.G. had not been regular and consistent. The issues and difficulties regarding visitation with R.G. are covered in *R.G. II, supra*, G061682 and *R.G. III, supra*, G063381. The court ordered a second section 366.26 hearing to address whether to change the permanent plan. It is significant that the court declined to find anybody at fault for the situation: "I think that we all can agree that no one has been on their best behavior in this case, but what is very clear to the Agency, and the truth of the matter is, is that whose fault it is not relevant today. It doesn't matter whether it's the legal guardians

19

creating barriers or the parents failing to follow up. The law doesn't give us any reason to consider [who's] at fault for this situation." The visitation order, with some modifications, remained in place.

C. *The Guardians Were in Direct and Willful Violation of the Visitation Order*

The visitation order made at the first section 366.26 hearing granted Mother and Father each supervised visitation with R.G. at least twice per month for a minimum of three hours per visit. After the postpermanency hearing, visitation with R.G. became particularly important to Mother's and Father's ability to prove the parental benefit exception continued to apply.

The Guardians' decision not to schedule visits and not to allow visitation after May 2024 was a direct and willful violation of the visitation order. The juvenile court found that the Guardians had thwarted visitation. SSA agrees the Guardians have violated the visitation order.

This is not a situation in which the visitation order is invalid. On its face, the visitation order did not delegate to the Guardians the power to determine the right and extent of visitation to the Guardians (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1123) and did not grant R.G. the absolute right to refuse a visit (*In re S.H.* (2003) 111 Cal.App.4th 310, 317 (*In re S.H.*)). A juvenile court may "delegate authority to the legal guardian to decide the time, place, and manner in which visitation will take place" but may not "delegate authority to the legal guardian to decide whether visitation would occur." (*In re M.R.* (2005) 132 Ca1.App.4th 269, 274.)

However, from June 2024 until the second section 366.26 hearing concluded on January 31, 2025, the Guardians refused to schedule visitation dates. By making a blanket decision that no future visits would be scheduled

20

or allowed, the Guardians impermissibly delegated to themselves the authority to decide whether visitation would occur and decided on their own that visitation with Mother and Father was not in R.G.'s best interest. (*In re M.R. supra*, 132 Ca1.App.4th at p. 274) That result is unacceptable.

D. *The Juvenile Court Erred by Denying Mother's Section 388 Petition and Delaying Decision on It Until the Conclusion of the Section 366.26 Hearing*

### 1. Mother and Father Took Immediate Steps to Enforce the Visitation Order

The Guardians' justification for not allowing visitation was they were distressful to R.G. and she did not want to go to them. In *In re Sofia M.* (2018) 24 Cal.App.5th 1038, the Court of Appeal concluded that when a dependent child refuses visitation, it is incumbent upon the noncustodial parent to pursue enforcement mechanisms for violations of visitation orders.[4] (*Id.* at pp. 1046–1047.) Here, unlike *Sofia M.*, Mother and Father pursued enforcement mechanisms.

After the juvenile court denied Mother's first section 388 petition, in August 2022, Mother immediately alerted us to problems with the visitation order: that given the troubled relationship between Mother (and Father) and the Guardians, the order amounted to a delegation of authority over visitation to the Guardians. (See *R.G. II, supra*, G061681 at p. 17.) We concluded in *R.G. II* that Mother's concerns with the order were premature and "prospective complaints about what the guardians *might* do are unripe give that the juvenile court continued its supervision." (*Ibid.*)

---

[4] We do not read *Sofia M.* as absolving the juvenile court of any obligation to offer input and propose ways to enforce a visitation order once a parent has made a request for it to do so.

21

Following the periodic review hearing in November 2023, Mother alerted us to her concerns over the modified visitation order. In *R.G. III*, Mother asserted the visitation order "impermissibly delegates authority over visitation to the guardians and hinders her and R.G.'s ability to preserve their beneficial relationship, thereby causing Mother to enter the section [366].26 hearing 'at a grave disadvantage.'" (*R.G. III, supra*, G063382, p. 13.) We again declined to overturn the visitation order because modifications made to the order, including a requirement that the Guardians document any denied requests for visitation dates, addressed Mother's scheduling concerns. (*Id*. at pp. 14–15.) We stated: "These additional requirements should address Mother's scheduling concerns, or alternatively give the juvenile court an increased understanding of why visitation is not occurring as ordered, in anticipation of the section .26 hearing. Accordingly, although we might not have made the same visitation order under the circumstances, we cannot say the court's modified visitation order was an abuse of discretion." (*Id*. at p. 15.)

Mother turned out to be correct. The modified visitation order did not resolve her concerns. Visitation problems not only persisted but got worse. The Guardians canceled the April 16, and May 24 and 30, 2024 visits at the last minute and refused to schedule any more visits. Once the Guardians announced they would no longer permit Mother and Father to visit R.G., Mother brought her section 388 petition to enforce the visitation order and allow visitation to resume. Father for his part sought to enforce the visitation order with his OSC re contempt.

### 2. The Juvenile Court Should Have Granted Mother's Section 388 Petition and Taken Steps to Enforce the Visitation Order

Before the Section 366.26 Hearing

In her section 388 petition, Mother alleged as changed circumstances the Guardians were "willfully disobeying" the visitation order and had canceled visits on short notice. Those allegations were indisputably true. Mother made the reasonable request that the juvenile court modify the visitation order by removing all discretion from the Guardians to cancel or schedule visits, vesting such discretion solely with SSA, and ordering make-up visits for all canceled visits.

The juvenile court's initial response to Mother's section 388 petition—setting a hearing on the section 388 petition on the same date as the section 366.26 hearing—might have been reasonable when that date was July 18, 2024. But once the hearing date on the section 366.26 hearing was continued, failure to resolve Mother's section 388 petition forthwith was error. No statute or rule required the juvenile court to conduct both the 366.26 hearing and the hearing on Mother's section 388 petition at the same time. Given the importance of visitation to proving the parental benefit exception, the Guardians' refusal to obey the visitation order left the juvenile court *no* discretion but to step in immediately and take action to protect Mother's and Father's visitation rights. Simply ordering more visits, as the juvenile court did on June 28 and August 24, 2024, was inadequate and easily flouted by the Guardians.

At the second 366.26 hearing, the juvenile court made a ruling on the parental benefit exception and termination of parental rights before addressing Mother's section 388 petition. The court found the first two elements of the parental benefit exception applied and expressly found there was "a substantial, positive, emotional attachment." The court terminated parental rights because, it found, the third element did not apply. In making

23

that finding, the court stated: "I'm not considering the lack of visits, but at the same time I am considering the amount of time that elapsed since [R.G.] has seen her parents."

Once the juvenile court found that Mother and Father had failed to prove the parental benefit exception, denial of Mother's section 388 petition became pro forma. As the juvenile court said, "[s]ince the 388 [petition] was directed toward visitation, I think in light of the court's ruling [on] terminating parental rights, I guess it moots the motion, but I deny it outright."

As of January 31, 2025, when the juvenile court terminated parental rights, Mother and Father had not been able to visit R.G. for eight months due to the Guardians having cut off all visitations. That lengthy lapse of time since R.G. had seen Mother and Father was the very outcome Mother's section 388 petition had sought to prevent.

"Section 388 plays a critical role in the dependency scheme" by "serv[ing] as an 'escape mechanism' to ensure that new evidence may be considered before the actual, final termination of parental rights." (*In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1506 (*Hunter S.*) The juvenile court, by combining the hearing on the section 388 petition with the second 366.26 hearing, and then continuing that combined hearing so that it was not completed until January 31, 2025, denied Mother and Father that escape mechanism and virtually doomed any chance they had of proving the parental benefit exception. (See *Hunter S.,* at p. 1508 [due to failure to enforce visitation order, "termination of parental rights was a foregone conclusion"]; *In re Monica C.* (1995) 31 Cal.App.4th 296, 307 ["The absence of visitation . . . may 'virtually assure[ ] the erosion (and termination) of any meaningful relationship' between mother and child."].)

24

*In re Alayah J.* (2017) 9 Cal.App.5th 469 presented an analogous situation. In that case, the mother brought a section 388 petition requesting unmonitored visits with her children and an assessment of her home for overnight visits and placement via a home of parent order. (*Alayah J.*, p. 476.) The juvenile court set the hearing on the mother's petition for the same date and time as a section 366.26 hearing and indicated it would consider that petition only if parental rights were not terminated. (*Alayah J.*, p. 477.) At the section 366.26 hearing, the court terminated parental rights and did not consider the mother's section 388 petition. (*Alayah J.*, p. 477.)

The Court of Appeal concluded the juvenile court erred by conditioning the grant of a hearing on the mother's section 388 petition on the nontermination of parental rights. (*Alayah J., supra*, 9 Cal.App.5th at pp. 480–481.) "By deferring consideration of mother's petition until after the section 366.26 hearing, the juvenile court circumvented the ""escape mechanism"" accorded to Mother by section 388 and foreclosed any opportunity for her to demonstrate a legitimate change of circumstances before her parental rights were terminated." (*Alayah J.*, at p. 481.) The Court of Appeal concluded, however, the error was harmless. (*Id.* at pp. 481–482.)

Although the juvenile court here simply combined the 366.26 hearing and hearing on Mother's section 388 petition, rather than conditioning one upon the result of the other, the result was similar to that in *Alayah J.* By combining the hearings, continuing them, first terminating parental rights and then denying the section 388 petition "in light of the court's ruling [on] terminating parental rights," the juvenile court circumvented the "escape mechanism" section 388 afforded (*Hunter S., supra*, 142 Cal.App.4th at p. 1506.)

25

E. *The Juvenile Court's Errors Were Prejudicial*

The errors here, unlike those in *Alayah J.*, were not harmless. Absent the juvenile court's errors, there was a reasonable probability the juvenile court would have reached a different decision at the section 366.26 hearing. (*In re Celine R.* (2003) 31 Cal.4th 45, 59–60; see *In re Alayah, supra,* 9 Cal.App.5th at p. 481.) The Guardians' decision not to schedule visits after May 2024, and the juvenile court's decision not to grant Mother's section 388 petition, directly impaired Mother's and Father's ability at the second section 366.26 hearing to prove the elements of the parental benefit exception. Indeed, the juvenile court considered the lapse of time since R.G. had seen Mother and Father in finding that terminating parental rights would not be detrimental to R.G. Although, as SSA argues, the juvenile court might have considered other factors, we cannot simply overlook what the juvenile court said it had considered. Had there been no such lapse of time, which is what Mother's section 388 petition sought to achieve, there would have been a reasonable probability the court would have made a different decision.

In addition, as Father argues, at the first section 366.26 hearing, when Mother and Father had had frequent visitation not thwarted by the Guardians, the juvenile court found the parental benefit exception applied. Evidence was presented at the second section 366.26 hearing that R.G. enjoyed visits with Mother and Father, the visits went well, and R.G. desired to have a bond with them.

Borelli concluded in her bonding study that R.G. had a strong desire to connect with Mother but "experienced many challenges to the connection in the form of prolonged separation and negative messages from her home environment." (Bolding and underscoring omitted.) The Guardians refusal to permit visits only prolonged that separation.

26

Borelli also concluded in her bonding study and testified that R.G. has an attachment bond with Mother that was beneficial, positive, and strong, though "not without anxiety." Borelli testified that severing the attachment bond between R.G. and Mother would be detrimental to R.G. Borelli testified that if parental rights were terminated, she would be concerned that R.G. "would really miss [Mother]; that [R.G.] would continue to experience some of the things she's experiencing already, which is sleep difficulties, which is discussed in the reports, which can be a sign of anxiety and depression in children her age; and that she, you know, will have—potentially have difficulties with her identity development with losing this connection with [Mother]." Borelli's study and testimony thus directly addressed the fundamental issue of "'what life would be like for the child in an adoptive home without the parent in the child's life.'" (*In re Andrew M.* (2024) 102 Cal.App.5th 803, 818.) Canul, in contrast, never addressed whether termination of parental would be detrimental to R.G.

The juvenile court found Borelli's testimony to be "very persuasive" as to the first two elements of the parental benefit exception. As SSA argues, the court was not required to follow Borelli as to the third element too. But in assessing prejudice, we must consider the lengthy period of time in which, due to the Guardians' refusal to obey the visitation order, Mother and Father were not able to visit R.G. The juvenile court considered that lapse of time in finding that terminating parental rights would not be detrimental to R.G. Had the visitation order been enforced, and there had been no such lapse in time, it is not only more likely the juvenile court's own finding of detriment would have been different, it is also more likely the

juvenile court likely would have found Borelli's testimony on the third element of the parental benefit exception to be persuasive.[5]

F. *The* Hunter S. *Case*

*Hunter S., supra,* 142 Cal.App.4th 1497 is analogous. The mother in *Hunter S.* had a "'loving close relationship'" with her son when the dependency petition was filed. (*Id.* at pp. 1500–1501.) Over the course of the proceedings, the mother served time in prison and the son became increasing reluctant to have any contact with her. (*Id.* at pp. 1501–1503.) Reunification services were terminated with guardianship as the permanent plan. (*Id.* at p. 1501.) A visitation order was in place, but the son ultimately refused to have any contact with the mother. (*Id.* at pp. 1502–1503.) For three years, the juvenile court took no action to enforce the visitation order. (*Id.* at pp. 1502, 1503, 1505.) The mother brought a section 388 petition seeking to reinstate reunification services. (*Id.* at p. 1503.) Following a combined section 366.26 hearing and hearing on Mother section 388 petition, the juvenile court denied the petition and terminated parental rights with a permanent plan of adoption. (*Id.* at pp. 1503–1504.)

On appeal, the mother contended the juvenile had failed to enforce the visitation order, thereby predetermining the permanent plan. (*Hunter S., supra*, 142 Cal.App.4th at p. 1504.) The Court of Appeal agreed. The son had been given "virtually complete discretion to veto visitation" and "[t]he visitation order was never enforced simply because [the son] continued to refuse any contact with his mother." (*Id.* at p. 1505.) The Court of Appeal concluded the juvenile court erred by failing to enforce the visitation order

---

[5] We are not persuaded by SSA's challenges to Borelli's methodology and bases for her conclusions.

and by denying the mother's section 388 petition. (*Id.* at pp. 1505, 1506.) The court explained how failure to enforce the visitation order made termination of parental rights a forgone conclusion: "By not enforcing its visitation order and delegating the discretion as to whether any visits occurred to others, the court effectively denied [the mother] any postreunification opportunity to repair her relationship with her son. The court then pointed to [the mother's] absence from [the son]'s life to explain the lack of a parental relationship, during a period in which he had become closer to and felt more secure with [the guardian]. This development, in turn, was used to justify the court's finding that it was not in [the son]'s best interest to grant the petition because there was no chance [the mother] could regain custody." (*Id.* at p. 1507.)

This case is similar to *Hunter S.* in several important respects. Although the visitation order here did not grant R.G. the right to veto visits, the Guardian's decision not to schedule visits after May 2024 produced the same result as in *Hunter S.*; that is, a third person, not the juvenile court, had unlimited discretion to determine whether visitation was to occur. (*Hunter S., supra*, 142 Cal.App.4th at p. 1505.) Here, as in *Hunter S.*, the juvenile court did not enforce the visitation order. The period of nonenforcement here was not as long as that in *Hunter S.*, but it was long enough to impair Mother's and Father's ability to prove the parental benefit exception still applied. By not enforcing the visitation order, and doing so well before the section 366.26 hearing, the juvenile court allowed a lengthy period of time to elapse without visitation, which, as in *Hunter S.*, was used as a justification for the court's decision to terminate parental rights.

G. *R.G.'s Unwillingness to Visit Mother and Father and Alienation From Them*

We are aware of evidence in the record of R.G.'s unwillingness to visit Mother and Father.[6] The Guardians reported that R.G. would tell them she did not want to go to visits and, following visits, threw tantrums. Once visits with Mother and Father were discontinued, R.G.'s behavior improved, she no longer threw tantrums, and seemed peaceful and happy.

Yet the juvenile court stated at the second section 366.26 hearing that it saw no evidence of the cause of R.G.'s behavior after visits with Mother and Father. The court believed the evidence showed R.G.'s impulsivity continued after visits had been discontinued.

There is evidence in the record that R.G. enjoyed visits. The visitation monitors consistently reported the visits with R.G. went well and R.G. seemed to enjoy them. R.G. seemed excited to see Mother and, at the end of the visit on January 28, 2024, R.G. said to her, "I want to go home with you." Despite initial refusal to get out of the car at the April 19, 2024 visit, R.G. laughed, hugged, and played with Mother. The juvenile court agreed with minor's counsel that if visits had been permitted, "they probably would have gone much like they were [previously] going"—that is, the visits would have gone well.

Borelli, who observed two visits, testified R.G. would run up to Mother, jump into her arms, and embrace her. When out of maternal aunt's

_____

[6] We are also aware of the limited means of enforcing a visitation order when, as here, the child is in a successful placement. Because R.G. is happy and thriving in the Guardians' care, the ultimate and perhaps most effective means of enforcing visitation—changing R.G.'s placement—was not an option. But that does not mean serious actions should not have been made to enforce the visitation order.

earshot, R.G. told Borelli she liked the visits with Mother. When R.G. was encouraged to visit, she did so, and enjoyed the visit.

The appellate record provides several explanations for R.G.'s behavior before and after visits that are consistent with reports that R.G. enjoyed them. Visits were often scheduled when the Guardians had planned a fun family event or when R.G. had an activity such as gymnastics. R.G. told Borelli she did not like visits because she hates the bath she has to take afterward. R.G.'s cousin explained that after visits the maternal aunt would give R.G. a bath and scrub her until her skin was red and hurt. R.G. also said she did not like the places where visits were held and she would like them if they were held at a place she wanted to go. A modified visitation order could have addressed those issues.

In addition, Borelli stated in her bonding study and testified that R.G. was getting negative messages from the Guardians about having affectionate feelings toward Mother and Father. Borelli testified there were indications in the record that the Guardians were telling R.G. "how to behave and potentially how to feel about her relationships towards [the Guardians]."

Indeed, there are distressing indications in the record that the Guardians had been working to alienate R.G. from Mother and Father. R.G. reported that the Guardians had told her not to kiss Mother or allow Mother to kiss her, not to call Mother "mommy" anymore, and the Guardians had taken R.G. away from Mother and Father because "they were not treating her right." In communications with the visitation monitor and SSA, maternal uncle referred to R.G. as his "daughter." While interviewing R.G. at the Guardians' home, Borelli heard R.G.'s cousin say Mother and Father were not R.G.'s parents and Mother and Father were "strangers" to R.G. The assigned social worker testified it appeared to her the Guardians had been

inappropriately coaching R.G. to call Mother and Father by their first names during visits, which was concerning to SSA because that could be detrimental to R.G.'s mental health.

Certainly a child should not be forced to visit a parent and "the child's input and refusal and the possible adverse consequences if a visit is forced against the child's will are factors to be considered in administering visitation." (*In re S.H., supra*, 111 Cal.App.4th at p. 317.) The juvenile court, however, never made a finding that requiring contact with Mother and Father would be deemed forced and therefore harmful to R.G. (See *Serena M. v. Superior Court* (2020) 52 Cal.App.5th 659, 673.) One responsibility of a child's caregiver—whether a parent or nonparent—is to encourage or even coax a reluctant child to participate in activities that are in the best interest of (i.e., good for) the child.

H. *The Order Denying Mother's Section 388 Petition and the Order Terminating Parental Rights Are Reversed*

In *Hunter S.*, the Court of Appeal reversed the order denying the mother's section 388 petition and, as a consequence, also reversed the order terminating parental rights. (*Hunter S., supra*, 142 Cal.App.4th at p. 1508.) The Court of Appeal concluded it served the son's best interests to remand the matter and direct the juvenile court to conduct a new hearing on the mother's section 388 petition "in light of the fact that [the mother] was denied visitation during the period about which she complains." (*Ibid.*)

We reach the same conclusions. Here, as in *Hunter S.*, we reverse the order denying the section 388 petition and, as a consequence, also reverse the order terminating parental rights. Although we conclude the juvenile court should have granted Mother's section 388 petition, due to the

regrettable length of time since that decision should have been made, we conclude it is in R.G.'s best interest to direct the juvenile court to conduct a new hearing on Mother's section 388 petition to determine whether and how to enforce the visitation order. On remand, the juvenile court should consider, in addition to the relief Mother requested, any other reasonable means available to enforce the visitation order. Our reversal of the order terminating parental rights and the order denying Mother's section 388 petition makes it unnecessary to reach Mother's and Father's due process arguments.

SSA argues termination of parental rights was necessary because R.G. is entitled to permanence in her life. The SSA reports and other evidence show that R.G. has developed a bond with the Guardians and is happy and thriving in their care. That is good, but does not in itself justify denial of visitation and termination of parental rights. A permanent plan is in place: R.G. has been and will remain in the Guardians' care. Nobody has suggested a different placement; returning R.G. to Mother's or Father's custody is not an option. "At the section 366.26 hearing, the question before the court is decidedly not whether the parent may resume custody of the child." (*Caden C., supra,* 11 Cal.5th at p. 630.) The case has been pending for a long time, too long perhaps, but combining the hearing on Mother's section 388 with the second section 366.26 hearing has only delayed a final resolution.

It has now been over 15 months since Mother and Father have been able to visit R.G. Considering R.G.'s young age, this long period of time with no visits will no doubt pose difficulties, perhaps insurmountable ones, for Mother and Father in maintaining a beneficial relationship with R.G. and proving that termination of parental rights would be detrimental to her.

Mother and Father are, however, entitled to at least a fighting chance to try. As the court in *Hunter S.* said, "absent a finding of detriment it is incumbent on the juvenile court to discharge its duty to ensure the parent's right of visitation is preserved, under conditions consistent with the child's well-being." (*Hunters S., supra*, 142 Cal.App.4th at p. 1508.)

## III.

### FATHER'S APPEAL FROM THE DENIAL OF HIS OSC RE CONTEMPT IS DISMISSED

Father argues the juvenile court erred by denying his OSC re contempt. He claims the court mistakenly believed that jail time was the only punishment available for contempt and, by denying his OSC, violated the court's duty to enforce its own orders.

We are not unsympathetic with Father; however we do not address the merits of his claim because an order made in a contempt proceeding is not an appealable order. (Code Civ. Proc., § 904.1, subd. (a)(1) [contempt judgment is not appealable]; Code Civ. Proc., § 1222 [judgment and orders in contempt cases are "final and conclusive"]; see *In re Holmes* (1983) 145 Cal.App.3d 934, 941 ["contempt judgments are final, conclusive, and not appealable"].)

"It is well settled that orders and judgments made in cases of contempt are not appealable, and this rule has been held applicable both where the trial court imposed punishment for contempt and where the alleged contemner was discharged. [Citations.] An order or judgment in a contempt matter may, however, be reviewed by certiorari [citations], and, where appropriate, by habeas corpus [citations]." (*John Breuner Co. v. Bryant* (1951) 36 Cal.2d 877, 878; see also *Walker v. Walker* (1958) 159 Cal.App.2d 67, 68 ["It is well settled that an order refusing to hold a litigant in contempt,

as well as one holding him in contempt, is not appealable."].) The same rule applies to an order dismissing a contempt proceeding. (*Butler v. Butler* (1967) 255 Cal.App.2d 132, 135–136.)

Because contempt rulings are not reviewable on appeal, when an appeal from such an order has been filed, the appropriate disposition is to dismiss the appeal. (*Butler v. Butler, supra*, 255 Cal.App.2d at p. 136 [dismissal of appeal from order dismissing contempt proceeding in divorce action]; *Walker v. Walker, supra*, 159 Cal.App.2d at p. 69 [same]; *John Breuner Co. v. Bryant, supra*, 36 Cal.2d at p. 878 [dismissal of appeal from order finding party not guilty of contempt].)

Applying these principles here, we conclude that Father may not appeal from the order denying his request to the Guardians in contempt. Father has not asked us to treat his appeal as writ petition, and there is no basis for doing so. Therefore, the appeal from this ruling will be dismissed.

DISPOSITION

Father's appeal from the order denying his OSC re contempt is dismissed. The order denying Mother's section 388 petition is reversed. As a consequence, the order terminating parental rights is also reversed.

The matter is remanded for further proceedings consistent with this opinion and subject to the following directions. A hearing on Mother's section 388 petition and a renewed section 366.26 hearing may not be combined in a single hearing. The section 388 petition must be heard and ruled upon within 90 days of the date of issuance of the remittitur unless good cause is shown to extend that deadline. The juvenile court may not schedule a section 366.26 hearing while Mother's section 388 petition is pending. Once the court rules on the section 388 petition, the court may,

depending upon its disposition of the petition, schedule and conduct a section 366.26 hearing. The parties are invited to stipulate to early issuance of the remittitur.

SANCHEZ, J.

WE CONCUR:

MOORE, J.

MOTOIKE, ACTING P. J.